940 P.2d 404

**Rita A. COYLE, Plaintiff–Appellee,**

v.

**Todd P. COMPTON, Defendant–Appellant.**

No. 18837.

Intermediate Court of Appeals of Hawai'i.

May 28, 1997.

Earle A. Partington, Honolulu, on the brief for defendant-appellant.

Rita A. Coyle, Kailua, plaintiff-appellee, pro se, on the brief.

Before BURNS, C.J., and ACOBA and KIRIMITSU, JJ.

ACOBA, Judge.

We hold in this appeal by Defendant–Appellant Todd P. Compton (Defendant), from the first circuit family court (court) February 16, 1995 Hawai'i Revised Statutes (HRS) Chapter 586 protective order barring Defendant's contact with Plaintiff-Appellee Rita A. Coyle (Plaintiff), that (1) the court did not err when it applied the preponderance of the evidence as the standard of proof under HRS § 586–5.5 (1993); (2) the court did not violate Defendant's equal protection or due process rights when it applied a preponderance of the evidence standard of proof; (3) the court did not abuse its discretion when it denied Defendant a continuance despite a temporary absence of Defendant's counsel; and (4) the court did not err when it excluded evidence of alleged harassment of Defendant's witnesses by Plaintiff and/or Plaintiff's brother, evidence of Plaintiff's visits to Defendant's abode after she had filed for a temporary restraining order (TRO), and evidence of Defendant's co-ownership of the property on

which Defendant and Plaintiff had been living.

## I.

The following is the relevant factual background of this case.

On October 8, 1994, Plaintiff and Defendant separated after Defendant was alleged to have physically abused Plaintiff by throwing his wallet in her direction and in the process, hitting her in the face with it. Defendant moved out of their joint residence on October 10, 1994 and moved in with a friend, Matthew Boone (Boone).

On November 22, 1994, Plaintiff sought and obtained a domestic abuse TRO against Defendant under HRS Chapter 586. Domestic abuse is defined in HRS § 586-1 (1993) as:

(1) Physical harm, bodily injury, assault, or the threat of imminent physical harm, bodily injury, or assault, extreme psychological abuse or malicious property damage *between family or household members;* or

(2) Any act which would constitute an offense under section 709-906 [abuse of family and household members], or under part V [sexual offenses] or VI [child abuse] of chapter 707 committed against a minor family or household member by an adult family or household member.

(Emphasis added.) HRS § 586-1 defines "family and household members" as "spouses or former spouses, parents, children, persons related by consanguinity, and persons jointly residing or formerly residing in the same dwelling unit." The TRO was issued pursuant to HRS § 586-4 (1993) which provides as follows:

*Upon petition to a family court judge, a temporary restraining order may be granted without notice to restrain either or both parties from contacting, threatening, or physically abusing each other,* notwithstanding that a complaint for annul-

ment, divorce, or separation has not been filed. The order may be granted to any person who, at the time such order is granted, is a family or household member as defined in [HRS § ] 586-1.

(Emphasis added.)

Plaintiff's ex parte petition for a TRO had stated in relevant part:

2. I am applying for protection

A. [X] for myself

3. I have the following relationship with the Defendant named above:

. . . .

E. [X] we used to live together;

. . . .

4. The following type of domestic abuse exists:

A. [X] recent past acts or acts of abuse have occurred. The Defendant has hurt me by (circle all that apply)

1. [circled] throwing something at me.

2. [circled] pushing, grabbing or shoving me.

. . . .

This happened most recently on [Handwritten] October 8, 1994.

B. [X] threats of abuse make it probable that acts of abuse may be imminent. The Defendant threatened to do the following to me (circle all that apply);

. . . .

2. [circled] hurt me physically.

. . . .

This happened most recently on [Handwritten] October 8, 1994.

C. [X] extreme psychological abuse or malicious property damage is imminent because:

[Handwritten] Since June of 1994 [he] has verbally abused me, ex. [sic] bitch, drunk, lush, slut, Due to This abuse I went to the doctor and have very high Blood pressure.[1]

---

1. This statement was later struck by the first circuit family court (court) because it determined that the time period was too remote from the date of application for a temporary restraining

order by Plaintiff–Appellee Rita A. Coyle (Plaintiff). Consequently, the court limited testimony at the petition hearing to the incident which

5. The Defendant:

. . . .

B. [X] may use illegal drugs.

On November 23, 1994, Defendant filed a verified answer, denying all of Plaintiff's allegations except admitting that he had lived with Plaintiff.

On February 6, 1995, the matter was called for hearing at 2:25 p.m. Plaintiff moved, pursuant to HRS § 586–5.5, for a protective order extending the period of the TRO. HRS § 586–5.5 provides as follows:

If after hearing all relevant evidence, the court finds that the respondent has failed to show cause why the order should not be continued and that a protective order is necessary to prevent domestic abuse or a recurrence of abuse, *the court may order that a protective order be issued for such further period as the court deems appropriate, not to exceed three years* from the date the protective order is granted. However, the court may terminate the protective order at any time with the mutual consent of the parties.

(Emphasis added.)

The parties were unable to agree on whether or not the protective order was to be mutually imposed. Therefore, in order to hear other pending cases and to enable the parties to meet and resolve the mutuality matter, the court ordered that the case be passed to the end of its trial calendar. At this point, defense counsel informed the court that he was due to argue a motion before the federal district court at 3:30 p.m. The case was recessed at 2:39 p.m.

At 3:12 p.m., court reconvened, but defense counsel had not returned from federal district court. Defendant informed the court that his counsel had told him he would be back in fifteen minutes. Accordingly, the court recessed at 3:12 p.m. and reconvened at 3:45 p.m. Although defense counsel was still absent, the court ordered the trial to

proceed. Defendant made the following objection:

I don't feel very comfortable representing myself. I hired an attorney for a reason. I'm sorry, we were called in here at 1:30 and we were here with all of our people and I just—I don't feel it's really fair to me to represent [sic] at this point.

At that point, Plaintiff's counsel examined two witnesses, Steven Applegate (Applegate) and Kari Yankish (Yankish). Defendant conducted cross-examination of Applegate and had begun cross-examination of Yankish when his counsel returned. Defendant's counsel appeared in court at 4:13 p.m. The court provided Defendant with a five-minute recess in order to allow him to confer with his counsel. Prior to the recess, the court informed defense counsel that Applegate had "stated he didn't see anything but he did hear things being thrown and an argument going on. He did see dents in the wall when he went back and looked at it later." The court also informed defense counsel that Yankish had "testified regarding an alleged violation of the restraining order by [Boone] coming by to receive—retrieve [Defendant's] personal property from the garage."

When court reconvened, Defendant's counsel objected to the court commencing the trial without him. The court noted the objection but directed defense counsel to proceed with cross-examination of Yankish. Defense counsel's motion to strike Yankish's testimony as irrelevant was denied by the court. Later, defense counsel moved to strike Yankish's testimony as hearsay. The court denied this motion on the ground it came too late.

Defense counsel questioned the court regarding the applicable standard of proof to be applied at the hearing. The court requested that defense counsel file a written brief concerning the standard of proof. After listening to further arguments, the court

---

occurred on October 8, 1994 and any incidents subsequent to October 8, 1994:
[Plaintiff's counsel]: Can I ask for a clarification of why you're striking C?
THE COURT: This [c]ourt believes that the statements made are remote and not—not close to the date of the application.

The [c]ourt believes that the allegations regarding events of October the 8th are—pivotal in this case.
[Plaintiff's counsel]: And any subsequent event thereto, is that correct?
THE COURT: That's correct.

recessed and ordered that all parties return the following day at 3:00 p.m.

When trial commenced the next day, February 7, 1995, defense counsel renewed his objection to the court's having commenced the previous day's trial without him. The court noted the objection and then entertained argument regarding the applicable standard of proof for Plaintiff's protective order motion because HRS § 586–5.5 did not specify that any particular standard be applied. Defense counsel argued that the standard of proof for HRS § 586–5.5, which addresses "domestic abuse," should mirror HRS § 604–10.5 (1993), which imposes a "clear and convincing" standard of proof for the issuance of a TRO against harassment "by any person." Defense counsel argued there was neither a rational basis nor a compelling state interest for applying different standards of proof under the two statutes. The court ruled that the applicable standard of proof was a preponderance of the evidence. Trial then continued with defense counsel's cross-examination of Yankish.

After Joanne Garcia, a neighbor, testified about the October 8, 1994 incident, Plaintiff testified. Plaintiff stated that from September to October 1994, her arguments with Defendant became "more and more frequent and more and more violent." Plaintiff recounted that Defendant had "massive mood swings," and she "never knew if he was going to be happy or sad or angry or violent." Also, Plaintiff reported that "[t]he day [Defendant] left after he hit [her] he told [her] he was going to burn the house down with [her] in it." Finally, Plaintiff related that after the TRO was issued, she received twelve letters from Defendant.

Defense counsel called Douglas Leandro (Leandro), Boone, Nancy Kini (Kini), and Defendant to testify. During the examination of Boone and Kini, defense counsel attempted to present evidence that Plaintiff's brother had threatened Boone and that Plaintiff had threatened Kini. Defense counsel argued that the evidence was critical for discrediting Plaintiff. The court, however, ruled that the testimony was irrelevant and thus inadmissible.

On February 15, 1995, defense counsel asked the court for permission to recall Boone and to allow Boone to testify that after the February 9, 1995 hearing, Plaintiff went to Boone's residence, where Defendant was staying, and "created a major scene at the property." Defense counsel sought to show that Plaintiff was not afraid of Defendant, and therefore, her statements in support of the TRO were false. The court excluded the testimony as irrelevant.[2]

Prior to defense counsel's examination of Kini, the court prohibited Kini from testifying that the property on which Plaintiff was residing was jointly owned by Defendant. The following day, defense counsel requested that the court reconsider its ruling, explaining that he should be able to demonstrate that Defendant was a co-owner of the property, and hence, unlikely to threaten to burn down the house as Plaintiff had alleged. The court chose not to alter its prior ruling, finding the evidence was still irrelevant.

At the conclusion of the trial, the court, having found sufficient evidence warranting the extension of the TRO, granted Plaintiff's motion for a protective order against Defendant for a total period of three years ending on February 16, 1998. Defendant's motion for a stay of the court's order pending appeal was denied by the court.

On March 17, 1995, Defendant filed his notice of appeal.

## II.

■ Defendant first contends that the court erroneously applied the preponderance of evidence standard of proof rather than the clear and convincing standard of proof at the hearing.

Preponderance of the evidence is defined as "proof which leads the jury to find that the existence of the contested fact is more probable than its nonexistence." Commentary to HRE Rule 304 (citing 2 John William

---

2. The court also excluded as irrelevant, the testimony of Defendant–Appellant Todd P. Compton (Defendant) regarding Plaintiff's contact with Defendant outside the courtroom during the proceedings.

Strong, *McCormick on Evidence* § 339, at 439 (4th ed.1992)).

Clear and convincing evidence, on the other hand, is defined as:

> an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases. It is that degree of proof which will produce in the mind of the trier of fact a firm belief of conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable.

*Masaki v. General Motors Corp.*, 71 Haw. 1, 15, 780 P.2d 566, 574–75, *reconsideration denied*, 71 Haw. 664, 833 P.2d 899 (1989) (citations omitted).

On its face, HRS § 586–5.5 does not set forth a specific standard of proof to be applied, but a closer examination of the statutory scheme which governs procedures of the family court reveals that the court was correct in applying a preponderance of the evidence as the standard of proof.

HRS § 586–2 (1993) provides, in relevant part, that "[a]n application for relief under this chapter may be filed in *any family court* in the circuit in which the petitioner resides." (Emphasis added.)

HRS § 571–14 (1993) establishes the family court system, and HRS § 571–14(8) (1993) mandates that "[t]he [family] court shall have exclusive original jurisdiction ... in all proceedings under chapter 586, Domestic Abuse Protective Orders." In that connection, HRS § 571–42 (1993) directs that, "[i]n any noncriminal proceeding arising under [HRS §]571–14 [the jurisdiction of the family courts], any findings of fact or disposition shall be based upon a *preponderance of evidence* admissible under the rules of evidence

applicable to the trial of civil cases." (Emphasis added.) Therefore, by virtue of HRS §§ 571–14(8) and 571–42, the family court is vested with exclusive jurisdiction over HRS Chapter 586 proceedings and the applicable standard of proof to be applied in those proceedings is that of a preponderance of the evidence.

## III.

■ Defendant maintains, however, that application of the preponderance of the evidence standard under HRS § 586–5.5 rather than the clear and convincing standard of proof used in HRS § 604–10.5 violates Defendant's equal protection rights.[3]

While HRS § 586–5.5 governs the issuance of restraining orders against abuse of family and household members, HRS § 604–10.5 governs the issuance of restraining orders to prevent harassment "of any person." HRS § 604–10.5 defines harassment as "an intentional or knowing course of conduct directed at an individual that seriously alarms or disturbs consistently or continually bothers the individual, and that serves no legitimate propose; provided that such course of conduct would cause a reasonable person to suffer emotional distress." Unlike the exclusive jurisdiction over HRS Chapter 586 domestic abuse orders vested in the family court, HRS § 604–10.5(c) (1993) provides, in relevant part, that "*[a]ny person* who has been subjected to harassment may petition *the district court* of the district in which the petitioner resides for a temporary restraining order and an injunction from further harassment." (Emphases added.) In a hearing on a petition to enjoin harassment, the district court must find by "clear and convincing evidence that harassment exists" in order to

---

**3.** The Fourteenth Amendment to the United States Constitution provides:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

> Article I, section 5 of the Hawai'i Constitution provides:
> Article I, section 5 of the Hawai'i Constitution provides:
> No person shall be ... denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.

Haw. Const. art. I, § 5.

issue an injunction. HRS § 604–10.5(f) (1993).

Defendant's premise is that HRS § 586–5.5 is "directed toward domestic situations where physical contact is more likely" and HRS § 604–10.5 is "directed to the non-domestic 'stalker' type situation where harassment is the first stage of often what becomes an escalating campaign against the victim." He reasons that because "both statutory schemes are aimed at protecting victims . . . from those who can and will abuse those victims," there is "no meaningful distinction between domestic and nondomestic situations" and therefore, there is no justification for the use of a different standard of proof under HRS § 586–5.5 from that required in HRS § 604–10.5. Defendant then concludes that application of the preponderance of the evidence standard of proof in the instant case "runs afoul of the equal protection clauses of the Fourteenth Amendment to the United States Constitution and Article I, § 5, of the Hawaii Constitution."

### A.

■ Under equal protection analysis, we must first determine whether the strict scrutiny or rational basis test is applicable. *Baehr v. Lewin,* 74 Haw. 530, 571, 852 P.2d 44, 63 (1993); *Nakano v. Matayoshi,* 68 Haw. 140, 151, 706 P.2d 814, 821 (1985). We apply strict scrutiny analysis to laws which involve classifications based upon suspect categories. *Baehr,* 74 Haw. at 571, 852 P.2d at 63; *Holdman v. Olim,* 59 Haw. 346, 349, 581 P.2d 1164, 1167 (1978). Under strict scrutiny analysis, the law is "presumed to be unconstitutional unless the state shows compelling state interests which justify such classifications and that the laws [involved] are narrowly drawn to avoid unnecessary abridgments of constitutional rights." *Baehr,* 74 Haw. at 571–72, 852 P.2d at 63–64 (citations and internal quotation marks omitted); *Nagle v. Board. of Educ.,* 63 Haw. 389, 392, 629 P.2d 109, 111 (1981); *Holdman,* 59 Haw. at 349, 581 P.2d at 1167.

■ However, where suspect classifications are not involved, we apply the rational basis test. *Baehr,* 74 Haw. at 572, 852 P.2d at 64; *Nagle,* 63 Haw. at 393, 629 P.2d at

112. Under the rational basis test, we inquire as to whether a statute rationally furthers a legitimate state interest and our inquiry seeks only to determine whether any reasonable justification can be found for the legislative enactment. *Baehr,* 74 Haw. at 572, 852 P.2d at 64; *Estate of Coates v. Pacific Eng'g, a Division of Pacific Lining Co., Inc.,* 71 Haw. 358, 364, 791 P.2d 1257, 1260 (1990); *State v. Sturch,* 82 Hawai'i 269, 276–77, 921 P.2d 1170, 1177–78 (App.1996), *cert. denied,* 82 Hawai'i 360, 922 P.2d 973.

■ HRS Chapter 586 applies to persons classified as family and household members. HRS § 586–1. A family and household member such as Defendant, against whom a TRO has issued, has not been traditionally recognized as belonging to a "suspect" category of persons, and Defendant does not cite any cases to us so holding. The Hawai'i Supreme Court has stated that:

[a] suspect classification exists where the class of individuals formed has been "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.

*Nachtwey v. Doi,* 59 Haw. 430, 434 n. 5, 583 P.2d 955, 958 n. 5 (1978) (quoting *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1293–94, 36 L.Ed.2d 16 (1973)).

Because for purposes of equal protection analysis, a suspect classification is not in issue, we conclude Defendant's claim that he was denied equal protection of the laws is subject to the rational basis test. *Sturch,* 82 Hawai'i at 276, 921 P.2d at 1177.

### B.

We apply the rational basis test, then, to determine whether there is any reasonable justification for adopting a different standard of proof for "domestic abuse" situations as opposed to harassment cases.

As previously indicated, HRS § 586–5 addresses the problem of domestic abuse by providing protection for an abused family or

household member through the issuance of a restraining order. The legislature enacted HRS Chapter 586 in 1982 "to streamline the procedures for obtaining and issuing ex parte temporary restraining orders to prevent acts of or the recurrence of domestic abuse." Hse. Conf. Comm. Rep. No. 1, in 1982 House Journal, at 815; *see also* Hse. Stand. Comm. Rep. No. 592, in 1982 House Journal, at 1165; Sen. Conf. Comm. Rep. No. 4, in 1982 Senate Journal, at 873. The Senate Standing Committee Report found that a restraining order serves "to cool violent relationships that have been developing for a number of years" and that giving the court "the discretion to extend protective orders" provides "greater flexibility in trying to calm the emotionally charged nature of such situations." Sen. Stand. Comm. Rep. No. 643, in 1982 Senate Journal, at 1222. Thus, the purpose of the restraining order is to "prevent[ ] acts of abuse, or a recurrence of actual domestic abuse, and assur[e] a period of separation of the parties involved." HRS § 586–4.

Later amendments to Chapter 586 sought "to better protect the victims of domestic abuse." Sen. Stand Comm. Rep. No. 1444, in 1987 Senate Journal, at 1521. The legislature recognized "that many victims of domestic abuse depend on protective orders to rescue them from violent attacks and threats of abuse." Hse. Stand. Comm. Rep. No. 549, in 1987 House Journal, at 1359. Consequently, in 1991, to "increase the effectiveness of protective orders," the legislature extended "the duration of protective orders in domestic abuse cases." Sen. Stand. Comm. Rep. No. 854, in 1991 Senate Journal, at 1059; *see also* Sen. Stand. Comm. Rep. No. 1015, in 1991 Senate Journal, at 1107. This expansion of the protective period was based on "[c]urrent information not[ing] that most women who had restraining orders issued by the courts continue to be harassed or threatened by their abusers for several

years." Hse. Stand. Comm. Rep. No. 524, in 1991 House Journal, at 1031. Such information led the legislature to conclude that "the current six months allowed for protective orders [was] not sufficient to protect women from the danger they continually face from their abusers." *Id.*

The legislature enacted HRS § 604–10.5 in 1986 "to allow the victims of intentional harassment to petition the district court for temporary restraining orders and injunctions to prevent the continuation of such acts." Hse. Stand. Comm. Rep. No. 761, in 1986 House Journal, at 1369. The legislature recognized that prior to the enactment of HRS § 604–10.5, there was "no civil statute that [could] be used to interrupt a course or pattern of intimidation which seriously disturbs the victim, but does not constitute a crime." *Id.; see also* Sen. Stand. Comm. Rep. No. 19, in 1986 Senate Journal, at 780.

Although there is legislative history regarding HRS Chapter 586 and HRS § 604–10.5, there is no legislative history indicating why the legislature chose to impose different standards of proof in "domestic abuse" cases and in harassment cases. In that event, we may consider how the legislature would have intended legislation to be applied had it considered the issue. *Sturch,* 82 Hawai'i at 278, 921 P.2d at 1179.[4]

We begin with the proposition that the assignment of domestic abuse cases to the exclusive jurisdiction of the family court is part of the State's policy of promoting the general welfare by protecting family members and household surrogates from harm:

The purpose of [HRS § 571–42] is to gather together all judicial activities which relate to children and the family. *The philosophy and approach of this specialized court is based upon the principle that the state has a responsibility to protects its*

---

**4.** In *State v. Sturch,* 82 Hawai'i 269, 921 P.2d 1170 (App.1996), we said:

 Absent explicatory legislative history, we may consider how the legislature would have intended the legislation to be applied.

 "If, after consideration of text, context, and legislative history, the intent of the legislature remains unclear, then the court may resort to general maxims of statutory construction to

aid in resolving the remaining uncertainty.... Those include, for example, the maxim that, where no legislative history exists, the court will attempt to determine how the legislature would have intended the statute to be applied had it considered the issue."
*Id.* at 278, 921 P.2d at 1179 (quoting *PGE v. Bureau of Labor and Indus.,* 317 Or. 606, 859 P.2d 1143, 1146 (1993)).

citizen[s], particularly those who cannot protect themselves, such as children, and to preserve family life and promote the general welfare.

Hse. Stand Comm. Rep. No. 130, in 1965 House Journal, at 550, (emphasis added); see also Sen. Stand. Comm. Rep. No. 272, in 1965 Senate Journal, at 917.

Seen in the light of this policy and the concerns expressed in the various legislative reports previously referred to, we believe the legislature could have determined that relationships in a family or household setting "developing for a number of years" and the "emotionally charged nature of such situations" would engender greater and more imminent risk of physical harm to a potential victim from another family or household member, than a similar risk which might arise for a petitioner in a harassment case from a person who was not a family or household member. Sen. Stand. Comm. Rep. No. 643, in 1982 Senate Journal, at 1222. Because, as the legislature found, "many victims of domestic abuse depend on protective orders to rescue them from violent attacks and threats of abuse," the legislature could reasonably conclude that only a minimal burden should be imposed on those seeking "protective orders." Hse. Stand. Comm. Rep. No. 549, in 1987 House Journal, at 1359. Logically, a preponderance of the evidence standard would facilitate the issuance of protective orders because it places a lesser burden of proof on the party seeking such an order than would a clear and convincing burden of proof. It would be reasonable, then, for the legislature to adopt a preponderance of evidence standard to expedite the judicial issuance of "protective orders." We hold, therefore, that there is a rational basis underlying the standard of proof adopted by the legislature for HRS Chapter 586.

### IV.

■ As part of his equal protection argument, Defendant also contends that this court's review of HRS § 586–5.5 should be conducted under the "strict scrutiny" test, because the protective order "constitute[s] a significant restraint upon liberty" and that "liberty is a fundamental right guaranteed by the state and federal constitutions." We believe, however, that this argument raises a substantive due process [5] claim rather than an equal protection claim. We examine two aspects of the due process claim: whether restrictions on Defendant's contact with Plaintiff and whether the application of a preponderance of the evidence standard unduly infringe upon Defendant's freedom of movement.

### A.

■ Strict scrutiny analysis is applicable in cases where the law "impinge[s] upon a fundamental right. Baehr, 74 Haw. at 571, 852 P.2d at 63; see also Sturch, 82 Hawai'i at 275, 921 P.2d at 1176. We must first determine, then, whether a HRS Chapter 586 protective order infringes upon a fundamental right.

■ Freedom of movement is a fundamental right guaranteed by the Hawai'i State Constitution. State v. Shigematsu, 52 Haw. 604, 609–10, 483 P.2d 997, 1000–01 (1971); Haw. Const.art. I, § 2. In Shigematsu, the Hawai'i Supreme Court indicated that an individual's freedom of movement includes,

> the right of men [and women] to move from place to place, to walk in the fields in the country or on the streets of a city, to stand under open sky in a public park and enjoy the fresh air, to lie down on a public beach and enjoy a sunbath, to visit a friend in his [or her] home and enjoy an evening together....

Shigematsu, 52 Haw. at 610, 483 P.2d at 1001.

A protective order may enjoin a family or household member for up to three years

---

5. The Fifth Amendment to the United States Constitution provides:
 No person shall be ... deprived of life, liberty, or property, without due process of law [.]
 U.S. Const. amend. V.

Article I, section 5 of the Hawai'i Constitution provides:
 No person shall be deprived of life, liberty, or property without due process of law[.]
 Haw. Const. art. I, § 5.

from performing any combination of the following acts:

(1) Contacting, threatening or physically abusing the petitioner;

(2) Contacting, threatening or physically abusing any person residing at the petitioner's residence;

(3) Telephoning the petitioner;

(4) Entering or visiting the petitioner's residence; or

(5) Contacting, threatening or physically abusing the petitioner at work.

HRS §§ 586–4 and 586–5.5. Hence, a protective order issued under HRS § 586–5.5 would appear to impinge upon a person's fundamental freedom of movement.

■ However, a person's freedom of movement is not absolute. Rather, "[i]t is generally recognized that in the exercise of its police power the State may curtail or restrict acts of individuals unless the curtailments or restrictions unreasonably infringe upon the fundamental personal rights of individuals." *Shigematsu*, 52 Haw. at 607, 483 P.2d at 999 (citing *Territory v. Kraft*, 33 Haw. 397 (1935)); *see also State v. French*, 77 Hawai'i 222, 231, 883 P.2d 644, 653 (App. 1994) (stating freedom of movement "is subject to the State's police power to regulate an individual's conduct for the protection of society").

Thus, the Hawai'i Supreme Court has observed that "there is no constitutionally protected right to remain free in [one's] home after physically harming someone residing there." *State v. Kameenui*, 69 Haw. 620, 623, 753 P.2d 1250, 1252 (1988); *cf. King v. State*, 574 So.2d 1013 (Ala.Crim.App.1990) (holding that defendant's constitutional right to travel was not abridged when he was ordered not to make contact with the victim he attempted to rape), *cert. denied* (1991). Accordingly, we conclude that a family or household member's freedom of movement may be restricted under the State's police power unless such restrictions unreasonably infringe upon that freedom.

In that regard, we believe HRS § 586–5.5 is "narrowly drawn to avoid unnecessary abridgments of constitutional rights." *Baehr*, 74 Haw. at 572, 852 P.2d at 64 (cita-

tion and internal quotation marks omitted). Under HRS § 586–5.5, a restraining order is only effective for a maximum period of three years. This three-year period is reasonable in light of the legislature's finding that "women who had restraining orders issued" continued to be "harassed or threatened by their abusers for several years." Hse. Stand. Comm. Rep. 524, in 1991 House Journal, at 1031. The acts prohibited are defined and objectively ascertainable. HRS §§ 586–4 and 586–5.5; *see also* discussion *supra*. The court may only issue orders *"necessary to prevent domestic abuse or a recurrence of abuse."* HRS §§ 586–4 and 586–5.5 (emphasis added). Thus, the statute mandates that each restraining order be tailored to the specific situation involved. Under these circumstances, we conclude that HRS Chapter 586 does not, on its face, unreasonably infringe upon a defendant's freedom of movement.

■ In the instant case, the protective order provided:

IT IS FURTHER ORDERED that:

A. THREATS AND ABUSE

Defendant is prohibited from threatening or physically abusing the Plaintiff and any other persons residing with the Plaintiff and from maliciously damaging the property of the Plaintiff.

B. CONTACT BETWEEN THE PARTIES

1. [X] Defendant is prohibited from *personally contacting the plaintiff* and any minor children residing in the household at home, school or babysitters which includes telephoning, visiting and/or remaining *within three (3) blocks of the place of residence, school and/or employment of the Plaintiff.*

(Emphases added.) This protective order does not unnecessarily restrict Defendant's movement. Its scope is limited to contact of a personal nature and to definite and compact physical areas. As such, the protective order does not unconstitutionally curtail Defendant's freedom of movement.

### B.

We hold, furthermore, that the application of a preponderance of evidence standard did not violate Defendant's due process rights. "The function of a standard of proof as that concept is embodied in the Due Process Clause and in the realm of factfinding, is 'to instruct the factfinder concerning the degree of confidence our society thinks he [or she] should have in the correctness of factual conclusion for a particular type of adjudication.'" *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (quoting *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 1075–76, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)); *see also Iddings v. Mee–Lee,* 82 Hawai'i 1, 13, 919 P.2d 263, 275 (1996); *Masaki,* 71 Haw. at 13–14, 780 P.2d at 573–74. It follows, then, that "[i]n cases involving individual rights, whether criminal or civil, the standard of proof at a minimum reflects the value society places on individual liberty." *Addington,* 441 U.S. at 425, 99 S.Ct. at 1809 (citation and internal quotation marks omitted).

Under the preponderance of the evidence standard, both "parties share the risk of an erroneous verdict in roughly equal fashion." *Masaki,* 71 Haw. at 14, 780 P.2d at 574 (citing *Addington,* 441 U.S. at 423, 99 S.Ct. at 1807–08); *see also Iddings,* 82 Hawai'i at 13, 919 P.2d at 275. On the other hand, under the clear and convincing proof standard, the interests of the alleged wrongdoer are deemed to be more substantial. Thus, the clear and convincing proof standard reduces the risk to the alleged wrongdoer of having his or her reputation tarnished erroneously by increasing the plaintiff's burden of proof. *Masaki,* 71 Haw. at 14, 780 P.2d at 574; *see also Iddings,* 82 Hawai'i at 14, 919 P.2d at 276. In this manner, the "standard [of proof] serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Masaki,* 71 Haw. at 14, 780 P.2d at 574; *see also Iddings,* 82 Hawai'i at 13, 919 P.2d at 275.

As we have pointed out, under a clear and convincing standard of proof, an alleged abused family or household member would carry a heavy burden in proving that a protective order should issue. The legislature, identifying a state interest in preventing domestic abuse and in protecting family and household members against physical harm, has instituted an expedited judicial process to promote that interest. We have concluded that there is a rational basis in treating domestic abuse situations differently from harassment cases. On the other hand, we have recognized that while HRS § 586–5.5 impinges upon a defendant's fundamental freedom of movement, that freedom is not unduly infringed or curtailed. Accordingly, HRS § 586–5.5 does not constitute a significant deprivation of a defendant's freedom of movement, requiring that he or she be afforded the greater protection of a clear and convincing standard of proof. *Cf. Addington,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (holding that clear and convincing standard is required by due process in a civil proceeding brought under state law to commit an individual involuntarily for an indefinite period to a state mental hospital because civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection); *Thompson v. Yuen,* 63 Haw. 186, 623 P.2d 881 (1981) (holding the due process rights of one acquitted by insanity are not violated when he or she is committed on a determination of risk of danger to self or the person or property of others by a preponderance of the evidence); *State v. Miller,* 84 Hawai'i 269, 933 P.2d 606 (1997) (holding HRS § 704–411(4), which places the burden on the insanity acquittee to prove, by a preponderance of the evidence, that he or she is fit to be released, does not violate due process principles).

We hold, therefore, that the legislature is not prohibited by the due process clauses from choosing the lesser burden of a preponderance of the evidence as the appropriate judicial basis for the issuance of a protective order. The legislature could have concluded that a lesser burden of proof was justified because the potential harm to a petitioner of an erroneous denial of an application for a protective order outweighed the limited deprivation of liberty to a respondent from the erroneous granting of such an order. *Cf.*

*Thompson,* 63 Haw. at 189, 623 P.2d at 883 (the justification for a preponderance of proof standard as opposed to the beyond a reasonable doubt standard lies in "the extent of the possibility and consequence of error" in denying a person his or her liberty) (quoting *United States v. Brown,* 478 F.2d 606, 611 (D.C.Cir.1973)). Therefore, we conclude that application of the preponderance of the evidence standard rather than the clear and convincing standard did not violate Defendant's right to due process.

### V.

 Defendant also argues that the court erred in beginning the hearing while his counsel was absent, in refusing to rehear the testimony which was taken while his counsel was absent, and in refusing to strike purported hearsay testimony of Yankish received into evidence while his counsel was absent.

 Defendant's argument that the court should not have proceeded in his temporary absence is equivalent to a contention that he should have been afforded a continuance of trial. Whether a continuance is granted or denied "is a matter that is addressed to the sound discretion of the trial court and is not subject to reversal on appeal absent a showing of abuse." *Kam Fui Trust v. Brandhorst,* 77 Hawaiʻi 320, 324, 884 P.2d 383, 387 (App.1994) (citing *Sanders v. Point After, Inc.,* 2 Haw.App. 65, 70, 626 P.2d 193, 197 (1981)). "Generally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (citing *Sapp v. Wong,* 62 Haw. 34, 41, 609 P.2d 137, 142 (1980)).

Contrary to Defendant's argument, we believe that the court did not "exceed the bounds of reason" and that Defendant did not suffer "substantial detriment."

The case originally had been set for trial on December 5, 1994. However, in order to accommodate defense counsel, who was on active military duty at the time, a continuance was granted. On February 6, 1995, the court gave both parties warning that the trial would proceed, with or without counsel, after the court had cleared its calendar. After the initial absence of defense counsel at 3:15 p.m., the court recessed again until 3:45 p.m., the time at which defense counsel had represented to Defendant that he would return.

At 3:45 p.m. when defense counsel had still not appeared, Plaintiff's counsel moved for default judgment. Instead of granting this motion, the court allowed Defendant to act pro se. In addition, the court intervened during the absence of Defendant's counsel to prevent the admission of what it deemed to be irrelevant evidence. When defense counsel returned, the court explained to him what had occurred with respect to the witnesses' testimony and allowed defense counsel to confer with his client. Because of the lateness of the hour, defense counsel did not have to proceed with his examination of the witness on the stand until the following day.

 In the interest of judicial economy, a judge is not expected to wait indefinitely. *See Norton v. Admin. Director of Court, State of Hawaiʻi,* 80 Hawaiʻi 197, 201–02, 908 P.2d 545, 549–50, (1995) (holding that the hearing officer did not abuse her discretion in denying a continuance because she acted within reason by accommodating the attorney), *reconsideration denied,* 80 Hawaiʻi 357, 910 P.2d 128 (1996); *Dep't of Gen. Servs., State of Iowa v. R.M. Boggs Company, Inc.,* 336 N.W.2d 408, 410 (Iowa 1983) ("[The] fact that an attorney has a conflicting trial schedule does not give him or her an automatic right to a continuance[.]"). Here, the court acted to prevent any prejudice which Defendant may have suffered during the twenty minutes that Defendant was without counsel. Moreover, Defendant does not indicate what evidence received during such absence redounded to his prejudice.

We conclude that under these particular circumstances, the court did not abuse its discretion when it proceeded to trial during the temporary absence of counsel. Because Defendant does not point to any "substantial detriment" resulting from the receipt of evidence during his counsel's absence, we cannot conclude it was necessary for the court to rehear the testimony received while defense counsel was absent or to strike Yankish's testimony.

## VI.

Further, Defendant maintains that the court erred in excluding certain evidence which he believes was relevant for the purpose of impeaching Plaintiff's testimony.

Hawai'i Rules of Evidence (HRE) Rule 609.1 is pertinent and provides, in part:

Evidence of bias, interest, or motive.

(a) General Rule. The credibility of a witness may be attacked by evidence of bias, interest, or motive.

(b) Extrinsic evidence of bias, interest, or motive. Extrinsic evidence of a witness' bias, interest, or motive is not admissible unless, on cross-examination, the matter is brought to the attention of the witness and the witness is afforded an opportunity to explain or deny the matter.

However, under HRE Rule 403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." As a result, admission of evidence of bias, interest, or motive rests in the discretion of the trial court exercised with due regard for HRE Rule 403. *State v. Balisbisana*, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996) (citation and internal quotation marks omitted); *State v. Silva*, 67 Haw. 581, 698 P.2d 293 (1985). Thus, when faced with what purports to be impeaching evidence, a trial court must determine whether "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Balisbisana*, 83 Hawai'i at 114, 924 P.2d at 1220; *see also* HRE Rule 403. A trial court's decision to exclude impeaching evidence will not be reversed absent a showing of abuse. *Alt v. Krueger*, 4 Haw.App. 201, 209, 663 P.2d 1078, 1083 (1983); *Hascup v. City and County of Honolulu*, 2 Haw.App. 639, 638 P.2d 870 (1982). We review Defendant's claims in this context.

## A.

Defendant claims that it was error for the court to exclude evidence regarding Plaintiff's and/or her brother's alleged harassment of Defendant's witnesses because the evidence "would have directly impeached [Plaintiff's] testimony." Plaintiff testified on February 7, 1995, February 8, 1995, and February 9, 1995. After Boone's testimony on February 9, 1995, court did not reconvene until February 15, 1995. Plaintiff's and/or her brother's alleged harassment of Defendant's witnesses occurred in the interim. As a result, in order to properly impeach Plaintiff, Defendant should have recalled Plaintiff to ask her about the alleged harassment prior to questioning Kini or requesting permission to recall Boone. Because Defendant did not follow this procedure, Boone's and Kini's testimonies were not admissible as extrinsic evidence to impeach Plaintiff. *See* HRE Rule 609.1(b).

Moreover, although the court might have determined that such evidence was relevant to Plaintiff's credibility, we believe the court could have also properly determined that such collateral matters would lead to "undue delay [or a] waste of time." *See* HRE Rule 403; *cf. State v. Zukevich*, 84 Hawai'i 203, 208 n. 5, 932 P.2d 340, 345 n. 5 (App.1997) (holding trial court's allowance of testimony under the "present sense impression" exception, if error, was harmless because statement was admissible under "excited utterance" exception). Thus, excluding the evidence under these circumstances did not constitute an abuse of discretion.

## B.

Defendant also contends it was error for the court to exclude evidence that Plaintiff repeatedly passed by one of Defendant's residences. According to Defendant, such evidence impeached Plaintiff's claim that she was afraid of Defendant. Despite Defendant's contention, evidence that Plaintiff had been by Defendant's residence was received at trial. Leandro, who was at Boone's house, testified that on January 4 and 5, 1995, he had seen Plaintiff stop in front of the house and then "spe[e]d off." Boone also testified

that since October 8, 1994, he had seen Plaintiff "at least three times ... drive in front of [his] house and real slow and look in and see what [he and Defendant] were doing." In addition, Boone testified that Plaintiff had called the house a few times "just detecting [sic] or trying to find out what [Defendant] was doing." Both Plaintiff and Defendant were questioned regarding these incidents. In light of this evidence, the court could have excluded additional evidence on this issue as "cumulative." *See* HRE Rule 403; *cf. Zukevich,* 84 Hawai'i at 208 n. 5, 932 P.2d at 345 n. 5.

of the real property. Plaintiff stated that she had never told Kini that Defendant was a co-owner of the property. Defendant stated that he was currently suing Plaintiff over the ownership of the property. The court's decision to prohibit other witnesses from testifying on the ownership issue was not an abuse of discretion considering the possibility that the instant case could turn into a trial on the merits of a pending partition suit between the parties. Thus, the court could have excluded such evidence as causing "undue delay" and as resulting in a "waste of time." *See* HRE Rule 403; *cf. Zukevich,* 84 Hawai'i at 208 n. 5, 932 P.2d at 345 n. 5.

### C.

Defendant lastly argues that it was error for the court to exclude evidence of Defendant's co-ownership of the property on which Plaintiff was residing because it was relevant to show that "(a) [Defendant] was unlikely to threaten to burn down his own property, and (b) this evidence was impeachment evidence as to [Defendant's] motive for testifying as she did." Again, contrary to Defendant's representation, there was evidence presented at trial regarding ownership

### VII.

For the foregoing reasons, we affirm the court's February 16, 1995 protective order.